**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Richard Lewis,

                                        Plaintiff,                    Civ. No. 04-4379 (RHK/RLE)
                                                                      **MEMORANDUM OPINION**
                                                                      **AND ORDER**
v.

St. Cloud State University,

                                        Defendant.

Marshall H. Tanick and Teresa J. Ayling, Mansfield, Tanick & Cohen, P.A., Minneapolis, Minnesota, for Plaintiff.

Scott R. Goings, Assistant Attorney General, St. Paul, Minnesota, for Defendant.

**Introduction**

Plaintiff Richard Lewis has sued Defendant St. Cloud State University (the "University") alleging he was unlawfully demoted from his position as Dean of the College of Social Sciences due to age discrimination and retaliation in violation of state and federal law. The University now moves for summary judgment on the grounds that its decision to terminate Lewis's deanship was wholly unrelated to his age or any protected activity, and that it is immune from Lewis's state law claims. For the reasons that follow, the Court will grant the University's Motion.

**Background**

Lewis joined the University as an assistant professor of history in 1976. (Lewis Dep. Tr. at 5.) He was subsequently promoted to full professor and, in 1997, became Interim Dean of the College of Social Sciences ("COSS") at the University. (Id. at 5-6.) In 1999, at age 62, Lewis was promoted to Dean of COSS. (Id. at 6-7.) In 2003, at the age of 66, Lewis was forced to resign from his position as Dean. (See, e.g., Ayling Aff. Ex. 37.)

COSS is one of five colleges at the University; it includes twelve academic departments and other programs, and approximately 130 members of the faculty and staff. (Spitzer Aff. ¶ 3.) Pursuant to the Personnel Plan governing the University, the Dean of COSS serves "at the pleasure" of the University President, subject to three months written notice of the effective date of termination. (Spitzer Aff. Ex. A.)

Prior to June 2002, Lewis reported to and was reviewed by the Vice President of Academic Affairs. Three individuals held that position during Lewis's time as Dean: Suzanne Williams, Ali Malekzadeh, and Ruth Meyer. (Lewis Dep. Tr. at 9-10.) The Vice President of Academic Affairs reviewed Lewis's performance annually in June or July, and Lewis consistently received positive reviews during his tenure as Dean. (See Ayling Aff. Exs. 11-14.)

In 1999, Williams gave Lewis high marks in all categories of his performance, and stated that Lewis made "[g]ood progress on bringing departments together as a college." (Id. Ex. 11.) In 2000, Malekzadeh gave Lewis similarly high marks on his performance review, and stated that "Lewis is a very effective leader who has provided good vision for his college. He is loyal, reliable, and effective." (Id. Ex. 12.) In 2001, Williams again gave

2

Lewis a positive review, stating: "I really appreciate you[r] fine decision making.  Your leadership of COSS has be[en] outstanding.  You have managed to resolve numerous issues before they escalate." (Id. Ex. 13.)  Finally, in 2002, Lewis received a positive review from Meyer, who stated: "I acknowledge that the year has been not easy because of the class action lawsuit and [other] issues . . . , but you have remained steadfast at all times, preserving your integrity and sense of loyalty to the college and the university." (Id. Ex. 14.)  Meyer's performance review was the last one Lewis received as Dean.

In spring 2002, Lewis suffered a heart attack.  He fully recovered and returned to work four weeks later.  (See Lewis Dep. Tr. at 63.)  On June 12, 2002, his first day back from medical leave, Lewis sought out Meyer, his supervisor at the time, to let her know he was back at work.  (Id.)  At that point, Meyer told Lewis that "the president had told her that there were rumors that [Lewis] wanted to retire and that a plan had been developed, a plan in which a search could be completed and [Lewis] would be replaced as of the following January." (Id.)  Lewis told her that he had "no intention of retiring . . . that [he] hadn't talked to anyone about retiring, it wasn't something [he] had considered." (Id. at 64.)  At the time of his conversation with Meyer, in addition to having just suffered a heart attack, Lewis was a named defendant in a class action lawsuit against the University (see infra n.2), and had recently been the subject of an investigation regarding his personnel decisions within COSS[1] (Ayling Aff. Ex. 26).  (Lewis Dep. Tr. at 64-65.)

---

[1]The details of this investigation of Lewis's personnel policies are not at issue here, and thus not fleshed out in the papers submitted to the Court.  For background purposes,

Lewis viewed the inquiry from Meyer as an attempt to force him out of his position due to his age.  (See id. at 68; Ayling Aff. Ex. 27.)  He testified that he reached that conclusion because "[h]aving gone through the period of stress, having had a heart attack and then I come back, there would be no other logical explanation.  Age would be the—This person is too old to do the job anymore, so we need to replace him."  (Lewis Dep. Tr. at 68.)  The day after his discussion with Meyer, Lewis sent a letter to the President of the University, Roy Saigo, which stated in relevant part:

> Yesterday, June 12, Academic Vice President Ruth Meyer informed me that 'rumors from the underground' were circulating that I wished to resign . . . in exchange for a sabbatical and that you had begun preliminary planning to conduct a national search to replace me effective January 2003.  I found this news profoundly disturbing. . . .
>
> Clearly this action by the president is trying to force me to resign. . . .
>
> The fact that your designee indicates that you are planning to act on the basis of 'underground rumors' is very unfortunate . . . [because] I am being told that I am planning to resign.  This creates a hostile work environment for me and constitutes blatant age discrimination.

(Ayling Aff. Ex. 27.)  The University took no action regarding the matter once Lewis disclaimed the rumor of his retirement.  (See Lewis Dep. Tr. at 67-68.)

---

however, it appears that an investigation was conducted "to determine the bases of the decision to terminate positions in [COSS] and allegations concerning retaliation and favoritism and consistent application of policy."  (Ayling Aff. Ex. 26.)  While the investigation generally cleared Lewis of allegations of retaliation and favoritism in his personnel decisions, it was not a resounding endorsement of some of the decisions that were subject to complaints.  (See id. (noting that a decision by Lewis was "perplexing," and stating that the investigative team assumed "the dean's decision . . . is a temporary, not permanent" one).)  The report of the investigation is dated May 2002.  (Id.)

In the spring and summer of 2002, the University administration was reorganized and, beginning in June 2002, Lewis reported to Michael Spitzer, the newly hired Provost and Vice President for Academic Affairs ("Provost").  Spitzer reported directly to President Saigo.  (Lewis Dep. Tr. at 9-10.)  Spitzer met with Lewis and each of the other deans at the University once every two weeks in his supervisory capacity.  (Lewis Dep. Tr. at 82-83.)  In May 2003, after working with Lewis for approximately eleven months, Spitzer made the decision to change the leadership of COSS and he recommended to Saigo that Lewis's deanship be terminated.

Spitzer asserts that he made the decision to change the leadership of COSS because he was concerned with three areas of Lewis's performance.  First, Spitzer felt that Lewis created a divisive environment between himself and the University administration.  (Spitzer Aff. ¶ 5.)  Spitzer was particularly unhappy with Lewis's handling of a matter involving possible alcohol use by a faculty member in the political science department.  (Id.)  In that incident, the chair of the Political Science Department accused a faculty member of coming to work intoxicated.  (Lewis Dep. Tr. at 84.)  Lewis disagreed with the strategy proposed by Spitzer for dealing with the faculty member.  (Id. at 85-86.)  While Spitzer asked that Lewis write a letter regarding the accusation to be placed in the faculty member's file, Lewis met with the faculty member but delayed in writing the letter.  (Id.)  Lewis was informed of Spitzer's dissatisfaction regarding his handling of the matter.  (See Lewis Dep. Tr. at 84 (referring to the matter involving a faculty member's possible alcohol

use, and stating "I think there was some measure of dissatisfaction in the way in which I dealt with a situation in political science").)

Second, Spitzer did not have confidence in Lewis's handling of interpersonal conflicts within COSS, of which there seemed to be a nearly constant barrage. (Spitzer Aff. ¶ 8; Spitzer Dep. Tr. at 111-12.) During Lewis's time as Dean, various departments in COSS experienced personnel conflicts. The History Department had a background of internal conflict between senior and non-tenured faculty.[2] (Lewis Dep. Tr. at 14-16.) Similarly, the Sociology Department experienced escalating conflicts, including investigations and hearings, between faculty members along race and gender lines. (Id. at 19-24.)

In April 2003, Lewis was the subject of a retaliation complaint made by a non-tenured faculty member in the Sociology Department. (Bowe Aff. Exs. B, D, E.) The complaint against Lewis came at the peak of an escalating dispute between two faculty members in the department along lines of race, gender, and sexual orientation. (See id.)

---

[2]One series of conflicts at COSS escalated to the level of a class action lawsuit filed in this Court in 2001 alleging religious discrimination and anti-Semitism on the part of the University, President Saigo, and several administrators, including Lewis. (Ayling Aff. Ex. 16.) That action, Zamora v. State of Minnesota, Civ. No. 01-1905, was settled by the University, under terms disclaiming any wrongdoing by any of the defendants in the case. There is no assertion that Lewis was responsible for any of the claims asserted against the University in the Zamora case. (See, e.g., Saigo Dep. Tr. at 55 (testifying that he did not think there was anything Lewis could have done to "alleviate, or minimize, or prevent, or fend off the Zamora case").) However, it appears that the class action lawsuit served as an omnipresent backdrop to Lewis's final year as Dean of COSS, and Lewis himself felt he may have been scapegoated in that controversy. (See Lewis Dep. Tr. at 91 ("I think it is possible that I was a scapegoat in the antisemitism lawsuit.").)

Both faculty members had filed formal complaints against each other and those complaints, along with the complaint against Lewis, were investigated by the University.  (See id.)

The escalation of this series of disputes was, in Spitzer's mind, something that Lewis should have worked more actively to diffuse.  (Spitzer Dep. Tr. at 110-112 (testifying that he thought Lewis was remiss in not working to de-escalate the situation, and that his "perception was that [Lewis] could have gotten more actively involved in it and help things settle down if he had tried to resolve the issue"); see also Saigo Dep. Tr. at 68-69 ("[w]hen you're an administrator you're expected to try to quell conflict and interpersonal disagreement.").)  Spitzer informed Lewis of his doubts regarding Lewis's handling of the matter.  (See Lewis Dep. Tr. at 112 ("[Spitzer] just said that [the Sociology Department faculty member] had a complaint against me and that he thought there was some merit to it.").)

Finally, Spitzer did not have confidence in Lewis's personnel recommendations and evaluations.  He observed that some faculty "were being favored at the expense of others . . . [o]n the basis of personal relationships . . . [w]ith [Lewis]."  (Spitzer Dep. Tr. at 15.)  He also noted that "there were recommendations which Dean Lewis made which contained inaccuracies based on the [scholarship] record [of the faculty member]."  (Id. at 18-19, 23.)  Spitzer believed that Lewis "devalued . . . the scholarly contribution of the faculty member in contrast to what was in the vitae of that faculty member."  (Id. at 23-24.)

In one incident, shortly after Spitzer started at the University, he was involved in reviewing a situation in which Lewis recommended against the tenure and promotion of a

faculty member who then appealed Lewis's recommendation. (See Spitzer Dep. Tr. at 43-49.) The faculty member's appeal resulted in her obtaining tenure and, after an internal investigation of the matter, she was also awarded a monetary settlement against the University. (See Spitzer Dep. Tr. at 44-47.) Spitzer felt that Lewis's recommendation "failed to account for the work [the faculty member] had done . . . and minimized her contributions." (Id. at 46.) He concluded that Lewis had "sided with the department chair" in a dispute between the chair and the faculty member, which Spitzer believed led to Lewis's negative recommendation against her. (Id. at 47.)

 In May 2003, Spitzer informed Lewis that he needed "to plan [his] retirement from the deanship." (Lewis Dep. Tr. at 81.) Lewis interpreted this statement as "clearly . . . saying, you're being fired. . . . You propose an exit strategy." (Id.) Spitzer informed Lewis that "it was desirable to have a change in philosophy" in the Dean position. (Spitzer Dep. Tr. at 126.) Lewis felt that Spitzer had "a negative view" of him and "some other deans . . . from the beginning" of Spitzer's position as Provost. (Lewis Dep. Tr. at 83.)

 Spitzer sought approval from President Saigo prior to informing Lewis of his decision regarding the deanship. (Saigo Dep. Tr. at 79-86.) Spitzer informed Saigo of his recommendation that Lewis's deanship be discontinued, and Saigo "took his recommendation." (Id. at 86.) While the decision whether to terminate Lewis's deanship was ultimately Saigo's (Saigo Dep. Tr. at 79), he gave deference to Spitzer's recommendation due to Spitzer's direct supervisory relationship with Lewis (id. (testifying that, if asked how he felt about Spitzer's recommendation, he "would answer that, [Lewis]

reports to you, and you have your reasons, and if they are solid, then I will support your decision.")).

Upon Spitzer's request that Lewis retire from the deanship, the parties attempted to negotiate the terms of his departure.  (See Ayling Ex. 36.)  In a June 19, 2003, letter to Spitzer, Lewis's attorney expressed his opinion that "it does not appear that there is any basis to terminating [Lewis] from [his position as Dean] other than his age."  (Id.)  He also wrote that "Dean Lewis wishes to remain in his position.  He feels he has done a good job, under trying circumstances.  He does NOT wish to leave his position."  (Id.)  Lewis remained in the Dean position throughout the negotiations.  In October 2003, when the negotiations failed to produce a mutually acceptable exit plan, Lewis's appointment as Dean of COSS was terminated.  (Ayling Aff. Ex. 37.)  Lewis is currently a tenured faculty member in the History Department at the University.  (Spitzer Aff. ¶ 11.)

On October 8, 2004, Lewis filed this action alleging claims under the Age Discrimination in Employment Act, 29 U.S.C. § 621 ("ADEA") (Compl. ¶¶ 7-20), Title VII's retaliation provision, 42 U.S.C. § 2000e-3 (id. ¶¶ 21-28), and the Minnesota Human Rights Act, Minn. Stat. §§ 363A.08 and 363A.15 ("MHRA") (id. ¶¶ 29-37).  The University now moves for summary judgment on all of Lewis's claims.

## Standard of Review

Summary judgment is proper if, drawing all reasonable inferences favorable to the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).

The moving party bears the burden of showing that the material facts in the case are

undisputed.  See Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety

Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The court must view the evidence, and the

inferences that may be reasonably drawn from it, in the light most favorable to the

nonmoving party.  See Graves v. Arkansas Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th

Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The

nonmoving party may not rest on mere allegations or denials, but must show through the

presentation of admissible evidence that specific facts exist creating a genuine issue for

trial.  See Anderson, 477 U.S. at 256; Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th

Cir. 1995).

## Analysis

Lewis asserts claims of age discrimination and retaliation.  He alleges that the

termination of his deanship was due to his age (Mem. in Opp'n at 27-45), and in retaliation

for his June 2002 complaint of age discrimination and his advocacy for faculty of color

during his time as Dean of COSS (id. at 45-54).  The University argues that Lewis's federal

claims fail on their merits (Mem in Supp. at 15-25), and his state law claims are barred by

the Eleventh Amendment (id. at 13-15).[3]  The Court will consider each argument in turn.

---

[3]The University has also moved to strike the testimony of Norbert Lovata under
Federal Rule of Evidence 702.  Lovata—whose professional background is in construction
management, engineering, and safety—submitted an affidavit in opposition to the
University's Motion for Summary Judgment opining that "there was no legitimate reason . .

A.    **Age Discrimination**

The ADEA forbids an employer from taking adverse employment actions against an employee because of his age.  29 U.S.C. § 623(a)(1).  To establish a claim of intentional age discrimination, a plaintiff may present direct evidence of such discrimination or may prove his claim through circumstantial evidence.  See Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003).  Where the plaintiff presents only circumstantial evidence of discrimination, the familiar burden-shifting analysis of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-04 (1973), applies.

Lewis proceeds with his age discrimination claim under the McDonnell Douglas framework.  McDonnell Douglas sets out a three-part burden-shifting framework for analyzing employment discrimination claims.  First, the plaintiff must establish a prima facie case.  Although the requirements of the prima facie case vary depending on individual circumstances, a plaintiff is generally required to show that (1) he was a member of the protected class—i.e., over the age of forty; (2) the employer took some type of adverse

---

. to terminate Dr. Lewis as Dean."  (Lovata Aff. ¶ 7.)  Lovata's testimony regarding the legitimacy of the University's proffered reasons for terminating Lewis's deanship lacks relevance and reliability, and would not be of material assistance to a jury.  Adams v. Ameritech Serv., Inc., 231 F.3d 414, 423 (7th Cir. 2000) (the Court, in "exercising its gatekeeping function, must examine (among other things) the expert's qualifications, the methodologies [he] used, and the relevance of the final results to the questions before the jury").  Furthermore, much of Lovata's testimony consists of legal conclusions rather than fact based opinion; such testimony is improper and not entitled to deference by the Court. Peterson v. City of Plymouth, 60 F.3d 469, 475 (8th Cir. 1995) ("legal conclusions were for the court to make" and the trial court abused its discretion in allowing such testimony). Accordingly, the Court will grant the University's Motion to Strike.

11

employment action against him; (3) he was meeting his employer's reasonable expectations

at the time of his termination; and (4) he was replaced by someone substantially younger,

Haas v. Kelly Services, Inc., 409 F.3d 1030, 1035 (8th Cir. 2005), or he must present other

"evidence adequate to create an inference that an employment decision was based on a[n]

[illegal] discriminatory criterion," O'Connor v. Consolidated Coin Caterers Corp., 517 U.S.

308, 312 (1996) (internal quotation and emphasis omitted) (alteration in original).

Once the plaintiff establishes a prima facie case, the defendant "must meet a burden

of production in the second step to articulate a legitimate non-discriminatory reason for

the adverse employment action." Hannoon v. Fawn Eng'g Corp., 324 F.3d 1041, 1046 (8th

Cir. 2003) (Title VII). Finally, if the defendant fulfills this second step, the burden returns

to the plaintiff to establish that the defendant's reason is a mere pretext for discrimination.

Id.

1.      Prima Facie Case

The University argues that Lewis's prima facie case fails on the fourth

element—that Lewis was replaced with an individual sufficiently younger to permit an

inference of age discrimination.  (Mem. in Supp. at 16-17.)  Lewis's immediate, albite

temporary, replacement was Carolyn Williams, who served as Acting and then Interim Dean

for approximately eight months; Williams is six and one-half years younger than Lewis.

(Chambers Aff. ¶ 3; Compl. ¶ 3.)  During the eight months that Williams served as Dean,

the University conducted a search for a permanent replacement for Lewis, and finally hired

Ronald Farrell, who is two years and seven months younger than Lewis.  (Spitzer Dep. Tr.

160-61; Chambers Aff. ¶ 3; Compl. ¶ 3.)  Farrell was Dean for one year, after which he

unexpectedly resigned.  Sharon Cogdill, who is eleven years younger than Lewis, is

currently serving as Interim Dean.[4]  (Spitzer Dep. Tr. at 163; Cogdill Dep. Tr. at 39.)  The

University argues that the age differences between Lewis and Williams, and Lewis and

Farrell, do not permit an inference of age discrimination.

In the age-discrimination context, an inference of discrimination at the prima facie

stage "cannot be drawn from the replacement of one worker with another worker

insignificantly younger."  O'Connor, 517 U.S. at 313.  Thus, the difference in age between a

plaintiff and his replacement will not raise an inference of discrimination if the

replacement is not "substantially younger" than the plaintiff.  Schiltz v. Burlington Northern

R.R., 115 F.3d 1407, 1413 (8th Cir. 1997) (internal quotation omitted).

While the Court has some reservation regarding Lewis's prima facie case, for

purposes of this Motion it determines that Lewis has raised an issue of fact as to whether

his "position [was] finally filled . . . with a person sufficiently younger to permit an

inference of age discrimination."  Id. at 1412.  Lewis's immediate replacement was six and

one-half years younger than him, and the current Dean of COSS is eleven years younger

than Lewis.  While Ferrell, the person hired as Lewis's permanent replacement after a

national search, was only two years and seven months younger than Lewis, and this age

difference by itself may not be sufficient to establish a prima facie case, see, e.g., id. at

_____

[4]The University is currently in the process of initiating another search for a
permanent Dean of COSS.  (Spitzer Aff. ¶ 13.)

13

1413 (age disparity of five years not sufficient), that age difference is not necessarily

dispositive here because other individuals filled Lewis's position before and after Ferrell

was hired.[5]  See also Parrish v. Immanuel Med. Ctr., 92 F.3d 727, 733 n.2 (8th Cir. 1996)

("Although we have often held that a plaintiff may establish a prima facie case by showing

replacement by a younger person, we have also adhered to the rule that the elements of a

prima facie case vary with the circumstances of the alleged discrimination." (citations

omitted)).  Accordingly, under the unique facts of this case, the Court determines that

Lewis has met, but barely so, the elements of his prima facie case.[6]

## 2.        Legitimate, Nondiscriminatory Reasons

The burden now shifts to the University to produce evidence of a legitimate,

nondiscriminatory reason for its decision to terminate Lewis as Dean of COSS.  The

University advances three categories of concerns that Spitzer had regarding Lewis's

performance as Dean: first, that Lewis created a divisive environment between himself and

the University administration (Spitzer Aff. ¶ 5); second, Lewis avoided dealing with

interpersonal conflicts and inappropriate behavior by faculty in the COSS (Spitzer Aff. ¶ 8);

and third, Lewis submitted disputed personnel recommendations that Spitzer perceived as

---

[5]The University has not cited any Eighth Circuit precedent holding that an age disparity of six and one-half years is insufficient to establish a prima facie case of age discrimination.

[6]There is no dispute that Lewis has satisfied the other elements of his prima facie case—he was 66 years of age when his deanship was terminated, he was subject to an adverse employment action, and he was meeting the University's legitimate expectations at the time of the termination.

tainted by Lewis's personal friendships with various faculty members (Spitzer Dep. Tr. at

25-6).  The Court determines that the University has satisfied its burden of production on

this element.[7]

### 3.  Pretext

At this stage, Lewis can avoid summary judgment only if the evidence considered in

its entirety (1) creates a fact issue as to whether the University's proffered reasons are

pretextual, and (2) creates a reasonable inference that age was a determinative factor in the

adverse employment decision.  Haas, 409 F.3d at 1035.  "[T]he ultimate burden of

persuading the factfinder of intentional age discrimination rest[s] with [Lewis] at all times."

Id. at 1036.

Lewis attempts to show that the University's reasons for his termination from the

Dean position were pretext for unlawful age discrimination based largely on the retirement

inquiry he received from the President's office in 2002.  In June 2002, upon his recovery

from a heart attack and subsequent return to work, Lewis was confronted with a rumor that

---

[7]Lewis attempts to discredit the reasons advanced by the University by justifying his actions, in effect arguing with Spitzer's conclusions regarding Lewis's weaknesses as Dean. (Mem. in Opp'n at 33-38.)  However, Lewis does not dispute that any of the specific incidents Spitzer highlighted as problematic actually occurred; rather, he argues, for example, that "Deans are not required to be perfectly in sync with the Provost and President on [faculty] recommendations, and disputing views are not infrequent within academia." (Id. at 38.)  Such arguments do not go to whether or not Spitzer's reasons for terminating Lewis are legitimate and nondiscriminatory.  Rather, they go to whether those reasons are wise and that is not a consideration for the Court in this inquiry.  Haas, 409 F.3d at 1036 ("We do not sit as a super-personnel department and second guess business decisions." (internal quotations and alternations omitted)).

he was considering retirement from the Dean position.  Lewis was offended by this inquiry,
indicated that he had no plans to retire from the Dean position, and wrote a letter to
President Saigo, stating in part that the inquiry "creates a hostile work environment for
[him] and constitutes blatant age discrimination."  (Ayling Aff. Ex. 27.)

According to the University, the June 2002 inquiry into Lewis's retirement plans
does not raise an inference that his termination from the deanship was based on age
discrimination.  At the time Lewis was asked about the retirement rumor, he had recently
suffered a stress-induced heart attack, was a named defendant in a class action
discrimination lawsuit against the University, and some of his personnel decisions had
recently been the subject of an internal investigation at the University.  Furthermore, it is
undisputed that a search for a replacement for Lewis would have taken a considerable
amount of time.

"[R]easonable inquiries into an employee's retirement plans do not permit an
inference of discrimination" based on age.  Sprenger v. Federal Home Loan Bank of Des
Moines, 253 F.3d 1106, 1113 (8th Cir. 2001); see Montgomery v. John Deere & Co., 169
F.3d 556, 560 (8th Cir. 1999) (affirming summary judgment for employer and stating that
an employer may make reasonable inquiries into the retirement plans of its employees);
Cox v. Dubuque Bank & Trust Co., 163 F.3d 492, 497-98 (8th Cir. 1998) (trial court
abused its discretion in not instructing jury that an employer may make reasonable
retirement related inquiries).  The Court determines that it was not unreasonable for the

University administration, having heard a rumor that Lewis was thinking of retiring from the deanship, to ask him directly about the accuracy of the rumor.

In an attempt to salvage his claim, Lewis relies on Cox for the proposition that an employer cannot base a decision to terminate an employee on rumors of that employee's plans to retire. (Mem. in Opp'n at 41.) In Cox, the plaintiff was asked or heard comments about her retirement plans almost every week for more than two years, and the comments indicated that she was expected to retire soon despite her continuous denials. 163 F.3d at 495. In contrast, Lewis was confronted once with a rumor of his plan to retire and, when he disclaimed the substance of the rumor, no action was taken based on the rumor. Thus, the facts of this case are clearly distinguishable from those presented in Cox. Furthermore, while the court in Cox held there was evidence from which a jury could determine that the plaintiff had been discriminated against, it reversed the verdict in her favor because the trial court had not instructed the jury that reasonable inquiries into an employee's retirement plans are permissible under the ADEA. Id. at 497-98.

Lewis also argues pretext based on the fact that, once Spitzer had decided to replace Lewis, Spitzer directed Lewis to plan his "retirement" from the deanship. It is clear from the record, however, that Spitzer, in suggesting Lewis retire, was attempting to provide Lewis with the opportunity to step down from the deanship voluntarily—on grounds mutually acceptable to the parties. Lewis testified: Spitzer "told me that I needed to plan my retirement from the deanship, I needed to plan my withdrawal from the deanship, and he needed to know what that plan was . . . ." (Lewis Dep. Tr. at 78-9.) Lewis also testified that

17

Spitzer asked him to "propose an exit strategy." (Id. at 81.)  The conversation, as reported

by Lewis, is consistent with Spitzer's desire to implement a change in the COSS leadership

in a dignified and respectful manner.

    Lewis also attempts to show pretext based on his receipt of positive annual

performance evaluations in the years leading up to his termination from the deanship.

(Ayling Aff. Exs. 11-14.)  None of those performance evaluations, however, was conducted

by Spitzer.  The receipt of positive reviews in the past, in and of itself, does not necessarily

raise an inference of age discrimination.  See Rose-Maston v. NME Hospitals, Inc., 133

F.3d 1104, 1109 (8th Cir. 1998) (past satisfactory evaluations did not establish pretext as

those "evaluations may show that [the plaintiff] had performed competently in the past, but

they do not render her more recent negative evaluations inherently untrustworthy").  This is

especially true here, as Spitzer was not involved in any of the prior performance evaluations

and had only been Provost for eleven months, during which time he came to the conclusion

that the leadership of COSS needed to be changed.  See, e.g., Zhuang v. Datacard Corp., 414

F.3d 849, 855 (8th Cir. 2005) (the fact that a new supervisor gave employee less favorable

reviews than previous supervisors "does not constitute evidence that those who supervised

[employee] in her later role . . . evidenced discriminatory intent by giving her less positive

reviews").  Furthermore, Spitzer's concerns regarding Lewis's performance as Dean

stemmed from issues that arose after Spitzer began his employment at the University,

which was also after Lewis's last positive performance review.  See also Brown v.

McDonnell Douglas Corp., 113 F.3d 139, 142 (8th Cir. 1997) (in the context of a

reduction-in-force, noting that "there is nothing inherently discriminatory in an employer

choosing to rely on recent performance more heavily than past performance").

Lewis further contends that Spitzer is not the relevant decision maker.  Rather,

Lewis argues that President Saigo is because he had veto power over Spitzer's

recommendation regarding Lewis.  According to Lewis, because Saigo did not express

independent reasons to terminate Lewis's deanship other than Spitzer's recommendation to

that effect, he must have relied on the rumors regarding Lewis's retirement or been

otherwise motivated by age-based animus.  (See Mem. in Opp'n at 39-41.)  There is no

question, however, that Spitzer, as Provost, was Lewis's direct supervisor; Spitzer was also

involved in the daily running of the University, and worked closely with Lewis in that

capacity.  That Saigo accepted Spitzer's recommendation for a change in the leadership of

COSS does not raise an inference that Saigo was acting out of age-based animus.

Accordingly, the Court determines that Lewis has not satisfied the burden, that ultimately

rests with him, of presenting a triable issue of fact that his deanship was terminated because

of age discrimination.  See Haas, 409 F.3d at 1036.

## B.    Retaliation

Lewis asserts that he was retaliated against by the University when his deanship was

terminated because he raised age discrimination claims and "because he supported rights of

faculty of minority groups and color."  (Mem. in Opp'n at 46.)  The McDonnell Douglas

burden shifting analysis governs the order and allocation of proof for retaliation claims.

Logan v. Liberty Healthcare Corp., 416 F.3d 877, 880 (8th Cir. 2005).  To establish a prima

facie case of retaliation, Lewis must show that (1) he participated in a protected activity,

(2) the University took adverse employment action against him, and (3) a causal connection

exists between the two.  Id.; Haas, 409 F.3d at 1036-37.

Lewis argues that he was retaliated against due to his June 2002 complaint of age

discrimination.  In June 2002, Lewis wrote to President Saigo claiming that the inquiry into

his retirement plans constituted age discrimination.  (Ayling Aff. Ex. 27.)  That letter was

sent more than ten months before Spitzer decided to terminate Lewis as Dean of COSS.

While there is no dispute that his complaint of age discrimination constituted

statutorily protected activity, Lewis does not present any evidence to establish a causal

connection between the complaint and Spitzer's decision to terminate him more than ten

months later.  When timing alone is suggested as proof of causation, the time between an

employee's complaint and the employer's action must be "very close."  Clark County Sch.

Dist. v. Breeden, 532 U.S. 268, 273 (2001).  Without any additional evidence indicating a

retaliatory motive, an eleven month interval does not satisfy this standard.[8]  See, e.g., Kipp

v. Missouri Highway and Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (two-month

interval not sufficient to show causation for purposes of retaliation claim).  Accordingly,

---

[8]The Court's conclusion regarding Lewis's retaliation claim is bolstered by the fact
that Spitzer had not begun employment at the University at the time of the rumor, and the
letter from Lewis is not directed at nor does it allege any wrongdoing on behalf of
Spitzer—the key decision maker with respect to Lewis's termination from the deanship.

the Court determines that Lewis has not established a prima facie case of retaliation based

on his complaint of age discrimination.[9]

Lewis also claims he was retaliated against because of his "efforts supporting the

rights of minority faculty." (Mem. in Opp'n at 48-54.) Lewis argues, among other things

that: he "was viewed by minority faculty as a strong advocate of their rights"; he

"occasionally urged the faculty to conduct broader searches for minority personnel and felt

stymied by their reluctance to do so"; and he "opposed discrimination by requiring a

minority be appointed to a search committee which had no minority members."[10] (Mem. in

Opp'n at 49.)

The Court determines that Lewis's retaliation claim with respect to his advocacy for

faculty of color must fail for want of a causal connection as well. There is simply no

_____

[9]On June 19, 2003, through his attorneys, Lewis again raised the issue of age discrimination—this time in a letter to Spitzer. (Ayling Aff. Ex. 36.) This letter was in response to Spitzer's decision to terminate Lewis's deanship. Lewis claims that the June 2003 letter constitutes another instance of protected activity (a complaint of age discrimination) after which he was terminated. (Mem. in Opp'n at 47, 50.) However, it is clear from the face of the letter and the undisputed facts, that Spitzer had already decided to terminate Lewis's deanship and had already informed Lewis of his decision. (See Ayling Aff. Ex. 36 (June 19, 2003 letter referring to Spitzer's "desire to remove . . . Lewis from his position as Dean").) Thus, as the decision to terminate Lewis's deanship had already been made, the June 2003 letter from Lewis's attorneys is not relevant to the retaliation analysis.

[10]The University argues that some of the actions Lewis contends were subject to retaliation do not qualify as statutorily protected activity because Lewis cannot show that he "stepped outside his role as an administrator representing the University" in connection with those activities. (Mem. in Supp. at 23.) See McKenzie v. Renberg's Inc., 94 F.3d 1478, 1486-87 (10th Cir. 1996). The Court will assume, for purposes of this Motion, that Lewis engaged in protected activity.

21

evidence that the alleged perception among faculty members that Lewis was an advocate for

faculty of color had anything to do with Spitzer's decision to terminate his deanship.  Lewis

testified regarding this claim as follows:

> I believe there was retaliation because I was willing to stand up for the rights
> of faculty of color and candidates of color.  I was perceived as a dean
> who had been very supportive of faculty of color.  When I came in as dean,
> there were ten faculty of color; when I left, there were 20.  I believe that by
> standing up for—acting affirmatively for—acting to support diversity, that a
> number of individuals opposed that. . . .

> [F]aculty members from sociology and the political science chair frequently
> went to the provost leadership to complain about me.  They were not
> frequently, but on some occasions.  And I think very broadly, deans were sort
> of blamed for all of the problems at the university.

(Lewis Dep. Tr. at 89-91.)  However, that faculty members may have perceived him as

advocating on behalf of faculty of color and that some of those faculty members were

opposed to this position does not lead to the conclusion that Spitzer held such an opinion.

Nor does Lewis directly allege as much.  The Court determines that Lewis has not

presented evidence sufficient to create a genuine issue of material fact with respect to a

causal connection between his advocacy for faculty of color and his termination from the

deanship.

   This conclusion is bolstered by the fact that Lewis concedes "[h]is advocacy for

faculty of color was a continuous matter that he carried on throughout his Deanship . . . ."

(Mem. in Opp'n at 50.)  In fact, Lewis's work on affirmative action hiring was mentioned as

a strength in one of his prior performance reviews.  (Ayling Aff. Ex. 11 ("Also made

affirmative action hire for Associate Dean.").)  That his advocacy was an ongoing attribute

of his deanship further weakens his attempt to relate such activities to Spitzer's decision to terminate him from that position.  Accordingly, Lewis's claim of retaliation will not survive summary judgment.

**C.      Eleventh Amendment Immunity**

In addition to his claims under the ADEA and Title VII, Lewis alleges age discrimination and retaliation claims under the MHRA.  The University asserts that Lewis's MHRA claims fail for lack of subject matter jurisdiction because of the University's immunity under the Eleventh Amendment of the United States Constitution.  (Mem. in Supp. at 13-15.)  According to the University, it is entitled to Eleventh Amendment immunity because it is part of the Minnesota State Colleges and Universities ("MnSCU") System, which is governed and regulated by state statutes, see, e.g., Minn. Stat. § 136F.10; the 15 Trustees on the board of MnSCU are appointed by the governor and confirmed by the Minnesota Senate, Minn. Stat. § 136F.02; and any monetary judgment against the University would be paid from a budget largely funded by the state treasury, Minn. Stat. §§ 135A.01, 135A.031.

The Eleventh Amendment "bars federal court jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest, regardless of the remedy sought." Cooper v. St. Cloud State Univ., 226 F.3d 964, 968 (citation omitted).  While there is no Eighth Circuit precedent squarely holding that schools in the MnSCU System are entitled to Eleventh Amendment immunity, the authority that does exist is highly suggestive of this conclusion.  See id., 226 F.3d at 968-69

23

(assuming, for purposes of its opinion, that St. Cloud State University would be entitled to the protection of the Eleventh Amendment); Egerdahl v. Hibbing Cmty. Coll., 72 F.3d 615, 618-19 (8th Cir. 1995) (holding that Hibbing Community College, which is also deemed a Minnesota state college or university under Minn. Stat. § 136F.10, had not waived its eleventh amendment immunity); see also Schneeweis v. Northwest Tech. Coll., 1998 WL 420564, at *5 (D. Minn. June 1, 1998) (noting that Egerdahl "is suggestive, if not conclusive, that the Court views the Minnesota Community Colleges as being covered by Eleventh Amendment immunity").  The Eighth Circuit has recognized that "the majority of cases addressing the question of eleventh amendment immunity for public colleges and universities . . . have held that these institutions are arms of their respective state governments and immune from suit."[11]  Treleven v. University of Minnesota, 73 F.3d 816, 819 (8th Cir. 1996) (internal quotation and alterations omitted).

Furthermore, it is generally recognized that "the vulnerability of the State's purse [is] the most salient factor in Eleventh Amendment determinations."  Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 48 (1994) (citations omitted); see also Treleven, 73 F.3d at 818 (noting that "whether the funds to pay any award will be derived from the state

---

[11]The University finds further support for its position in unpublished state court cases that consider MnSCU an arm of the state.  (Reply Mem. at 3.)  See Latour v. Minneapolis Cmty. and Tech. Coll., 2001 WL 185085, at *2 (Minn. Ct. App. Feb. 27, 2001) (stating that "[i]t is clear that MCTC is part of MnSCU and that MnSCU is an arm of the state"); O'Sullivan v. State, 1999 WL 1058238, at *3 (Minn. Ct. App. Nov. 23, 1999) ("MnSCU is a state agency that consolidates control of all state universities, community colleges, and technical colleges.").

treasury" is a factor to consider in determining whether an entity is entitled to Eleventh

Amendment immunity (internal quotation and citations omitted)).  Thus, courts often

conclude that whether an award against the defendant would be paid largely from the state

treasury is the most important factor in the immunity analysis, and have accorded the state

treasury factor dispositive weight.  See Hess, 513 U.S. at 49.  In the instant case, an award

against the University would be paid from a budget largely funded by the state treasury.  See

Minn. Stat. § 135A.031 ("The direct appropriation to each board for instructional services

shall equal 67% of the estimated total cost of instruction for . . . the state universities, and

the community colleges.").  While Lewis attempts to avoid this unfavorable fact by pointing

to specific instances in which MnSCU and state funds are kept separate (Mem. in Opp'n at

26), he does not challenge the basic premise that much of the University's budget is

provided through the state treasury.[12]  Accordingly, the Court determines that the University

is entitled to Eleventh Amendment immunity from Lewis's state law claims.[13]

_____

[12]Lewis also briefly argues that the University waived its immunity because the
defense "was not raised, or even mentioned in . . . the Answer."  (Mem. in Opp'n at 26.)  The
University argues that it did not waive its immunity defense because it clearly raised lack of
subject matter jurisdiction as a defense in its Answer.  (Answer ¶ 24 ("The Court lacks
subject matter jurisdiction over some or all of Plaintiff's Claims.").)  Shortly after filing
the Answer, the University again raised the defense in its Statement of the Case.  (Doc. No.
9 ("This Court lacks subject matter jurisdiction over Plaintiffs state age and retaliation
claims because of the immunity provided by the Eleventh Amendment . . . .").)  The Court
determines that the University did not waive its Eleventh Amendment immunity, especially
given that any consent to suit in the face of available Eleventh Amendment immunity must
be "unequivocally expressed."  Raygor v. Regents of the University of Minnesota, 534 U.S.
533, 547 (2002).

[13]Even if the University was not entitled to Eleventh Amendment immunity, this
Court would reach the same result on the merits of Lewis's state law claims as it did on his

**Conclusion**

Based on the foregoing and all the files, records and proceedings herein, it is

**ORDERED** that St. Cloud State University's Motion for Summary Judgment (Doc. No. 21)

is **GRANTED**, and Lewis's Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

It is further **ORDERED** that the University's Motion to Strike the Testimony of Norbert

Lovata (Doc. No. 36) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Dated: November 23, 2005                         s/Richard H. Kyle
                                                 RICHARD H. KYLE
                                                 United States District Judge

---

ADEA and Title VII claims.  See, e.g., Baucom v. Holiday Companies, Inc., ___ F.3d ___ ,
2005 WL 3005490, at **2-3 (8th Cir. Nov. 10, 2005) (analyzing ADEA and MHRA claims
under same standards).  Lewis does not argue that these claims would be subject to
different analyses on the merits.